UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS R. BOLES,

       Plaintiff,

vs.                                                                    Case No.

LIFE INSURANCE COMPANY                          HON.
OF NORTH AMERICA,

       Defendant.

_____

Troy W. Haney (P48614)
HANEY LAW OFFICE, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503
Telephone:  616-235-2300
Facsimile:  616-459-0137
Email:  thaney@troyhaneylaw.com

_____

## **COMPLAINT**

       Plaintiff, Dennis R. Boles, by his attorney, Troy W. Haney of Haney Law Office, P.C., and

for his complaint against Defendant, Life Insurance Company of North America, states as follows:

### **Nature of Action and Jurisdiction**

1.     This is a civil complaint brought by Plaintiff, Dennis R. Boles ("Plaintiff"), under the

Employee Retirement Income Security Act ("ERISA"), §502, 29 U.S.C. 1132, regarding

breach of the terms of an employee benefit plan and breach of fiduciary duties, for the

purpose of compelling Defendant to provide certain disability insurance benefits in

amounts and at the coverage levels promised and for an accounting, recovery of damages,

costs, and attorney fees incurred as a consequence of Defendant's breaches of its obligations and duties under ERISA as detailed herein.

2.      This Court has subject jurisdiction over Plaintiff's claims pursuant to ERISA §502(e) and (f), 29 U.S.C. 1132(e) and (f) and 28 U.S.C. 1331.

3.      Venue properly lies in this District pursuant to ERISA §502(e)(2), 29 U.S.C. 1132(e)(2).

## Parties and General Allegations

4.      At all relevant times, Plaintiff was a participant, as defined by ERISA §3(7), 29 U.S.C. 1002(7), in the CBRE Services Inc. ("CBRE") Group Health and Welfare Benefit Plan ("the Plan") provided by CBRE, to its eligible employees, including Plaintiff, administered and funded by an insurance policy issued by Defendant, Life Insurance Company of North America ("LINA") to CBRE, for group disability benefits as group policy no. FLK-980105.

5.      At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA §3(1), 29 U.S.C. 1002(1), sponsored by CBRE and funded by the above-referenced insurance policy issued by LINA. As such, LINA is the proper party to defend this matter and the sole entity responsible for the payment of claimed benefits set forth below.

6.      At all relevant times, Defendant was the fiduciary of the Plan within the meaning of ERISA §3(21), 29 U.S.C. 1002(21), in that Defendant acted as a claims administrator and as a fiduciary for the Plan and exercised authority and control over the payment of long term disability "LTD" benefits, which are assets of the Plan. Pursuant to 29 C.F.R. §2560.503-1(h)(1), Defendant, therefore, functioned as an administrator for claims procedure purposes.

**Facts**

7.     At all relevant times the Plaintiff was employed full-time by CBRE as a Director of

Construction Project Management, until his last day of work on October 25, 2018.

8.     The Plaintiff has described his job duties as follows:

> Drive/walk to multiple construction sites in 12 million square feet of buildings on 3 major sites in Indianapolis. Inspection of construction job sites. Running design and construction job meetings. Inspection of land, facilities and equipment. Running/attending business and design meetings. Develop job scope and cost estimates. Use of computer and related equipment. Climbing stairs, ladders, and ship ladders during inspections. Accessing mechanical and electrical spaces, interstitial spaces, clean rooms, and confined spaces. Move equipment/components of up to 50 pounds. While traveling, lifting/carrying luggage of up to 45 pounds, computer and computer bag of 20 pounds. Supervised 12 to 15 people and was responsible for hiring and firing of employees.

9.     The Plaintiff has a history of chronic back pain and has undergone three back surgeries to

date, which are described as follows:

| 06/24/2005 | Operative report, Surgeon: Dr. Marquart | NAME OF PROCEDURE: Left L5 hemilaminectomy with L4-5 micro lumbar discectomy with operating microscope. |
|---|---|---|
| 03/09/2009 | Operative report, Surgeon: Dr. Maxwell | DIAGNOSIS: Degenerative disk disease.  Severe spinal stenosis L4-5.<br>OPERATIVE PROCEDURE:<br>1.  Revision laminectomy L4, L5.<br>2.  Segmental fixation bilateral L4-5.<br>3.  Inter-transfer fusion bilateral L4-5.<br>4.  Anterior instrumented interbody fusion (OptiMesh) L4-5. |
| 10/26/2018 | Operative Report, Surgeon: Dr. McCanna | PREOPERATIVE DIAGNOSIS: Status post L4-L5 lumbar fusion. Adjacent segment degenerative stenosis with bilateral foot drop, left greater than right.<br>INDICATIONS FOR PROCEDURE: The patient is a 62 year old male status post L4-L5 fusion He has had surgery at L5-S1.  He may have had a posterolateral fusion at L5-S1, although it does not appear to be definitive on CT and there was no instrumentation at that level.  There is residual/spondylitic stenosis of the foraminal region at L5-S1 that is severe.  This is worse on the left than right and he does have a foot drop.  He also has stenosis at the level above his fusion L3-L4, to a lesser degree L2-L3. There is a disk herniation at L2-L3 as well. |

10.     The Plaintiff's diagnosed medical conditions are as follows:

- Severe Axonal Mixed Sensory Motor Peripheral Polyneuropathy;

- Bilateral chronic L4, L5 and S1 Lumbar radiculopathy;

- Degenerative disc disease lumbar spine;

3

- Spondylosis;
- L2-L3 wide laminectomy defect;
- L3-L4 bilateral osseous foraminal narrowing;
- L4-L5 mild central canal stenosis;
- L4-L5 mild-moderate bilateral osseous foraminal narrowing;
- L5-S1 mild central canal stenosis with left worse than right subarticular zone stenosis;
- L5-S1 moderate bilateral foraminal narrowing;
- Grade 1 retrolisthesis at L2-L3 through L5-S1;
- Low grade biforaminal stenosis;
- Sacroiliac joint degenerative joint disease;
- Atherosclerotic calcifications;
- Mild S-shaped scoliotic curvature of the thoracic spine;
- Small paracentral protrusion at the T9-10 and T10-11 levels;
- Anterolisthesis, small central protrusion and facet hypertrophy right greater than left with uncovertebral hypertrophic degenerative changes on the right at the C3-4 level contribute to abutment of the exiting right C4 nerve with suspected mild compression;
- Left paracentral protrusion at the C5-6 levels results in partial effacement of the leftward ventral cord;
- Uncovertebral hypertrophic changes and facet hypertrophy contributing to the abutment of the existing left C6 nerve;
- Cubital Tunnel Syndrome, status post-surgery March, 2019;
- Right mild severity Carpal Tunnel Syndrome;
- Left borderline mild severity Carpal Tunnel Syndrome;
- Diabetes Mellitus Type II;
- Migraine Headaches;
- Tension Headaches;
- Short term memory loss;
- Obstructive sleep apnea.

11.     Due to the above-described medical conditions and the associated symptomatology, the Plaintiff experiences numbness, weakness, and tingling in his lower extremities that also causes a loss of strength and balance that creates an ongoing risk of falls, and therefore the Plaintiff uses a cane to assist when walking. When the Plaintiff experiences a migraine or tension headache, it can last upwards of four to six hours at a time, and also causes aphasia that results in confusion, difficulty concentrating, dizziness, drowsiness, lack of energy,

and mental fog. The Plaintiff also has side effects from his medications, including brain

fog and an inability to concentrate and focus. The Plaintiff's medical records also state he

is experiencing depression and anxiety - these conditions are due to his reduced quality of

life as a result of the above-described physical medical conditions and should be considered

as "reactive" depression.

12.     The Plaintiff is also in constant pain. The Plaintiff has described his various forms of pain

as follows:

- Continual pain, numbness, burning sensations in feet, ankles and lower legs;
- Continual twitching of muscles in feet, ankles and lower legs;
- Periodic cramping in muscles in feet, ankles and lower legs;
- Foot drop and lack of dorsiflexion in both feet (left worse than right);
- Episodic pain, numbness in left thigh;
- Continual pain in lumbar back;
- Continual pain in thoracic back;
- Continual pain in neck;
- Migraines/Pre-migraines 1-2 times per week;
- Headaches 2-3 times per week;
- Numbness, pins and needles sensation and pain in 4th and 5th fingers of left hand.

13.     The Plaintiff's physical limitations are as follows:

- Unable to maintain balance on left foot for more than 3-5 seconds;
- Unable to maintain balance on right foot for more than 4-8 seconds;
- Poor balance/high risk of fall;
- Unable to drive more than 30 minutes without pain;
- Unable to sit for more than 30-40 minutes without pain;
- Unable to stand for more than 10 minutes without pain, trembling in left leg;
- Unable to walk more than 1/4 mile without pain;
- Difficulty walking on uneven surfaces;
- Unable to climb more than one flight of stairs without pain;
- Unable to read computer screen for more than 1 hour at a time;
- Painful to squat with difficulty maintaining balance;
- Difficulty pick up small objects from floor;

5

- Painful to kneel and to rise from kneeling;
- Painful to bend;
- Painful to lift more than 25 pounds;
- Painful to carry 20 pounds for more than 30 feet;
- Painful to carry 10 pounds more than 50 feet;
- Painful to reach above head or to sides;
- Difficulty using keyboard;
- Poor grip strength in 4th and 5th fingers of left hand.

14.   In accordance with his employment contract, the Plaintiff applied for long term disability benefits through LINA, which were approved on January 8, 2019 with an effective start date of January 24, 2019.

15.   As provided by the Plan, the Plaintiff is a "Class 2 Employee", which is a regular full-time employee regularly working a minimum of 30 hours per week, as defined by Amendment No. 6 to the Plan on April 11, 2018.

16.   The definition of "Disability/Disabled" within the Plan for Class 2 Employees, as amended by Amendment No. 4 to the Plan on August 8, 2016, is as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> > 1) unable to perform the material duties of his or her Regular Occupation; and
> >
> > 2) unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
>
> > 1) unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> >
> > 2) unable to earn 80% or more of his or her Indexed Earnings.
>
> The Insurance Company will require proof of earnings and continued Disability.

17.   On June 25, 2019, the Plaintiff had an EMG conducted, wherein his diagnosis of Severe Axonal Mixed Sensorimotor Peripheral Polyneuropathy was confirmed, and which is a

permanent condition that will not improve and will only worsen with time. This condition

is further described as follows:

> Sensorimotor polyneuropathy is a condition that causes a decreased ability to move or feel (sensation) because of nerve damage.
>
> CAUSES
> Neuropathy means a disease of or damage to nerves. When it occurs outside of the central nervous system (CNS), that is, the brain and spinal cord, it is called a peripheral neuropathy. Mononeuropathy means one nerve is involved. **Polyneuropathy means that many nerves in different parts of the body are involved.**
>
> Neuropathy can affect nerves that provide feeling (sensory neuropathy) or cause movement (motor neuropathy). It can also affect both, in which case it is called a sensorimotor neuropathy.
>
> **Sensorimotor polyneuropathy is a bodywide (systemic) process that damages nerve cells, nerve fibers (axons) and nerve coverings (myelin sheath). Damage to the covering of the nerve cell causes nerve signals to slow or stop. Damage to the nerve fiber or entire nerve cell can make the nerve stop working.** Some neuropathies develop over years, while others can start and get severe within hours to days.[1] (Emphasis added).

18.   At the time of the Plaintiff's surgery on October 26, 2018, he was temporarily living in

Indianapolis, Indiana, as this was required by his employment at the time, and this is where

he also received follow-up medical treatment in the hopes that he would recover and be

able to return to work. However, because the Plaintiff did not sufficiently recover he was

unable to return to his position as the Director of Construction Project Management for

CBRE, and he was terminated from his position in September 2019. The Plaintiff then

returned to his permanent home in Muskegon, Michigan in October 2019, where he

continued to receive additional medical treatment.

19.   On February 21, 2020, Lona Amirkhanian, RN, a Nurse Case Manager for the Defendant,

completed a file review of the Plaintiff's claim, and in part noted the Plaintiff had "moved

---

[1] Definition of Sensorimotor Polyneuropathy: https://medlineplus.gov/ency/article/000750.htm

to Michigan and [transferred] his care and advised us to obtain [his] new treating [physician's] info".

20.    In approximately the end of February 2020, the Defendant had an occupation review completed by Melissa Mendez, MS, CRC, who <u>inaccurately</u> described the Plaintiff's position as "Sedentary", and stated in part in her report,

> Claimant's own occupation was found to be that of a Project Director (189.117-030, Sedentary). This occupation requires sedentary work ability according to the U.S. Department of Labor's Dictionary of Occupational Titles, which is defined as, exerting up to 10 lbs. of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.

21.    The Dictionary of Occupational Titles ("DOT"), provides a job description for Project Manager as follows:

> Plans, directs, and coordinates activities of designated project to ensure that goals or objectives of project are accomplished within prescribed time frame and funding parameters: Reviews project proposal or plan to determine time frame, funding limitations, procedures for accomplishing project, staffing requirements, and allotment of available resources to various phases of project. Establishes work plan and staffing for each phase of project, and arranges for recruitment or assignment of project personnel. Confers with project staff to outline workplan and to assign duties, responsibilities, and scope of authority. Directs and coordinates activities of project personnel to ensure project progresses on schedule and within prescribed budget. Reviews status reports prepared by project personnel and modifies schedules or plans as required. Prepares project reports for management, client, or others. Confers with project personnel to provide technical advice and to resolve problems. May coordinate project activities with activities of government regulatory or other governmental agencies.[2]

While this job title partially describes the Plaintiff's occupation of Director of Construction Project Management, it fails to fully capture the additional physical requirements that are involved with this position when it is conducted in a construction site environment.

---

[2] Project Director, 189.117-030: https://occupationalinfo.org/18/189117030.html

22.    On March 26, 2020, the Social Security Administration ("SSA") issued a favorable

decision and granted the Plaintiff's claim for Social Security Disability Insurance ("SSDI")

benefits, with an effective date of April 1, 2019. The SSA decision stated in part,

> The claimant has the following severe impairments: degenerative disc disease of the lumbar, cervical, and thoracic spine, post-multiple lumbar surgeries; bilateral carpal tunnel syndrome; left cubital tunnel syndrome post release surgery; obesity; and migraine headaches. * * *

> …he can perform no lifting or carrying over ten pounds. The claimant can also only occasionally reach, handle, finger, and feel, bilaterally. Furthermore, the claimant requires a sit/stand option, where he is allowed to alternate between sitting for twenty minutes and standing for ten minutes throughout the day. The claimant also requires the use of a handheld assistive device for ambulation. The claimant can only occasionally balance, stoop, kneel, crouch, and climb ramps or stairs, and he can never crawl or climb ladders, ropes, or scaffolds. Additionally, the claimant is limited to performing only occasional work in wetness or with vibration, and he can never work near moving mechanical parts or at unprotected heights. * * *

> After considering the record as a whole, I have determined that the claimant can perform less than the full range of sedentary work. This residual functional capacity is supported by the claimant's history of treatment; the claimant's history of surgical intervention; the objective medical studies; the clinical examination findings; the claimant's medication regimen; and the opinions of Dr. Brill, Dr. Gange, Dr. Ruiz, and Dr. Shipley.

> **The claimant is unable to perform any past relevant work.**

> A vocational expert, Michelle Ross, testified at the hearing. After consideration of Ms. Ross' testimony, I have determined that the claimant has the following past relevant work:

> - Contract Coordinator (Dictionary of Occupational Titles (DOT code # 162.117-018): skilled (SVP 8); generally performed at the light exertional level; actually performed at the medium exertional level);

> - Construction Superintendent (DOT code #182.167-026): skilled (SVP 7); generally performed at the light exertional level; actually performed at the medium exertional level; and,

> - Real Estate Business Opportunity Developer (DOT code #189.157-010): skilled (SVP 7); generally performed at the light exertional level; actually performed at the medium exertional level. (Emphasis added).

Notably, the SSA utilized job descriptions that more accurately reflect the Plaintiff's light

to medium exertional level position of Director of Construction Project Management.

23.    On April 20, 2020, the Plaintiff submitted a letter to the Defendant, in part to update the

Defendant regarding the Plaintiff's new team of physicians in Michigan, including Kyle

McKinney, D.O. and John Hawkins, D.O., but also to notify the Defendant that his medical appointments had been cancelled and rescheduled multiple times due to the Governor of Michigan's COVID-19 pandemic restrictions.

24.    On June 30, 2020, the Defendant had an Occupational Analysis completed by Paul Wilson, MA, CRC, in order to compare the restrictions and limitations provided by the SSA with the Plaintiff's occupation of Director of Construction Project Management. However, instead of using the DOT job titles/codes provided by the SSA, which were light to medium level exertional level positions, Mr. Wilson continued to use the DOT job title/code previously used by the Defendant of Project Director, 189.117-030, a sedentary level position. However, in the end Mr. Wilson did ultimately conclude that the Plaintiff's current restrictions and limitations were not consistent with the required physical demands of the occupation of Project Director.

25.    In mid-2020, the Plaintiff attended appointments with his new physicians, Drs. Hawkins and McKinney, who included in part in their office visit notes the following:

> **July 1, 2020 – Office Visit Note – John Hawkins, D.O.**
> CHIEF COMPLAINT: Numbness right lower leg and left lower leg. Dennis is a 64 year old male here today for evaluation of bilateral lower extremity pain and back pain. Has been ongoing for about 9 years. – He describes the pain as sharp, stabbing, aching, burning, shooting. – **Worse with sitting, bending, twisting, laying in bed, standing and lifting.** * * *
>
> IMPRESSION:
> 1. Dennis has back pain that is axial.
> 2. He also has symptoms consistent with diabetic neuropathy. * * *
>
> I will have him follow up with me as needed. (Emphasis added).
>
> **August 13, 2020 – Office Visit Note – Kyle McKinney, D.O.**
> Diabetes: He presents for his follow up diabetic visit. He has type 2 diabetes mellitus. Hypoglycemia symptoms include hypoglycemia associated headaches. – His home blood glucose trend is increasing steadily * * *
>
> ASSESSMENT/PLAN:
> Peripheral polyneuropathy (primary) – fused from L2-S1. Patient wants evaluated for the neuropathy that continues to decline.

Orders: Ambulatory referral to Physician Medicine Rehab

26.   On September 24, 2020, at the request of the Defendant, the Plaintiff attended an "Independent" Medical Examination ("IME") with Shlomo Mandel, M.D. Although Dr. Mandel provides a lengthy summary of his review of the Plaintiff's medical records, and he even confirms the Plaintiff's medical diagnoses and completes a Physical Ability Assessment form, he does not provide any opinion or analysis regarding whether or not the Plaintiff can continue to work in his own occupation. And while an absence of a stated opinion may not initially seem significant, for Dr. Mandel, who has a lengthy history of providing IME reports for the Defendant that affirmatively state that claimants are not disabled from performing work – the absence of a stated opinion on the Plaintiff's ability to work is significant and considered by the undersigned to be an indirect show of support for the Plaintiff's disability.

27.   On October 13, 2020, the Defendant had a Transferrable Skills Analysis ("TSA") completed by Kristina DeSantis, MA, CRC. Notably, the only medical information provided to Ms. DeSantis for review was the IME report from Dr. Mandel. Ms. DeSantis also continued to use the inaccurate job description of Project Director for the Plaintiff's previous occupation. Ms. DeSantis concluded in her report that the only position the Plaintiff could potentially perform was that of Project Director, but which is not an accurate representation of the Plaintiff's own occupation, which is more accurately described as Contract Coordinator, Construction Superintendent, and/or Real Estate Business Opportunity Developer. It should also be noted that the Plaintiff would still be prevented from performing the position of Project Director, a sedentary level position, due to his back pain that is exacerbated by prolonged sitting.

28.     On October 15, 2020, the Defendant issued a letter to the Plaintiff notifying him that it was

terminating his LTD benefits based on the following decision:

> After completing our review of your claim, we are unable to continue paying benefits beyond October 23, 2020. * * *
>
> We completed a review of your LTD claim to determine if you were still unable to perform your own occupation as a Project Director or any other occupation as of January 24, 2021. * * *
>
> You have claimed disability from your own Sedentary occupation as a Project Director which is considered Sedentary work as defined by the Dictionary of Occupational Titles (DOT):
>
> **_S-Sedentary Work_** - Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
>
> We then referred your claim to our vocational department for review for a Transferable Skills Analysis… This review confirmed that you would be able to perform the following sedentary occupation:
>
> • Project Director, DOT Code #189.117-030*
>
> *Your our occupation * * *
>
> While we are not disputing your diagnosis or symptoms you are having, the medical documentation provided for review does not reveal a physical functional impairment with a level of severity that would support your inability to perform the essential duties of your own Sedentary occupation.
>
> At this time, you no longer meet the definition of Disability stated above and your claim has been closed.

Notably, the entire termination of benefits is based on the false premise that the Plaintiff's

own occupation was a sedentary exertional level based position.

29.     On November 4, 2020, the Plaintiff was evaluated to start twelve sessions of physical

therapy with a physical therapist, Mark Stevens, who stated in his initial evaluation,

> Patient seen for physical therapy evaluation today. Patient has a history of multi-level spinal fusion with increased neurological symptoms in bilateral lower extremities. Patient has numbness that follows the L4, L5, S1 dermatome on the left and L5 S1 dermatome on the right. Patient has foot drop on the left and poor plantar flexion on both sides. Patient has never used an [ankle foot orthosis] before, will request a script form the doctor for an evaluation for this. Patient has poor cost [sic] ability for balance and decreased strength in bilateral lower

> extremities. Will need skilled therapy to evaluate this and educate patient for a home exercise program… Patient will be seen twice a week for six weeks.

30.   On April 5, 2021, the undersigned appealed the Defendant's decision to terminate the

Plaintiff's LTD benefits, providing additional medical records and documentation, as well

as a Physician Statement of Disability from Dr. Kyle McKinney, which stated in part:

> I first met and evaluated Mr. Boles on January 28, 2020, when he established at my medical practice as a new patient due to a recent move from Indiana to Michigan.

> From my review of Mr. Boles' medical records, I am aware that he has a long history of chronic back pain, three subsequent lumbar surgeries and a multitude of diagnosed medical conditions * * *

> Mr. Boles has complaints of numbness weakness and tingling in his lower extremities, which causes loss of strength and balance and creates a fall risk. In that regard, Mr. Boles uses a cane to assist when walking. Mr. Boles is in constant pain. When experiencing a migraine or tension headache, they can last upwards of four to six hours at a time and cause: confusion, difficulty concentrating, dizziness, drowsiness, lack of energy, mental fogginess. * * *

> As Mr. Boles' primary care physician, in the past year, I have had the opportunity to examine him in a clinical setting, and it is my medical opinion that Dennis Boles is totally disabled from his own occupation as a Project Director and from any and all full-time occupations at this time.

31.   On May 24, 2021, the Plaintiff supplemented his appeal with additional medical records

from his physical therapy sessions at the Mary Free Bed Rehabilitation Hospital. Included

in those records was a description of the Plaintiff's impairments and limitations, as

described by Jonathan Hake, PTA, which stated,

> Impairments/Limitations: Ambulation deficits, Balance deficits, Bed mobility deficits, Endurance deficits, Impaired sensation, Joint restriction, Mobility deficits, Pain limiting function, Poor body mechanics, Safety awareness deficits, Soft tissue restriction, Strength deficits, Transfer deficits.

32.   On May 28, 2021, the Defendant had a paper-file review completed by a neurologist,

Norman Burns, M.D. Although Dr. Burns was provided with a large collection of records

for review, he stated that he is unable to support any restrictions and limitations after

October 23, 2021, but only because he was not provided with any medical documentation

for the period in question. Additionally, Dr. Burns did not attempt to communicate with

any of the Plaintiff's current physicians located in Michigan, but instead, submitted questions by facsimile on May 20, 2021 to Aruna Rau, M.D., the Plaintiff's neurologist in Indiana who had not treated the Plaintiff in approximately 18 months. And although Dr. Burns was requested by Defendant to allow 14 days for Dr. Rau's response, after only 8 days without a response, he finalized his report. It should also be noted that at no time did Dr. Burns ever examine the Plaintiff.

33. On June 14, 2021, the Defendant had a second paper-file review completed by an occupational medicine physician, Frank Polanco, M.D. Although Dr. Polanco did conclude that the Plaintiff has permanent restrictions, including limiting walking and standing to only 15 minutes at a time; a limit of lifting and carrying only up to 10 lbs.; and no crawling, kneeling, stooping, and climbing; his ultimate opinion was that the Plaintiff could continue to work full-time within these restrictions in a sedentary level position. Additionally, Dr. Polanco did not attempt to communicate with any of the Plaintiff's current physicians located in Michigan, but instead, submitted questions by facsimile on June 7, 2021 to Shannon McCanna, M.D., the Plaintiff's neurologist in Indiana who had not treated the Plaintiff in approximately 2 years, and although Dr. Polanco was requested by Defendant to allow 14 days for Dr. McCanna's response, after only 7 days without a response, he finalized his report. It should also be noted that at no time did Dr. Polanco ever examine the Plaintiff.

34. Although the Plaintiff had submitted additional physical therapy records for review to the Defendant (see ¶ 31) prior to the above-referenced paper-file reviews being conducted (see ¶¶ 32 and 33), those records were never submitted to Drs. Burns or Polanco for review, not prior to their review, nor at any later date for an addendum report.

14

35.     On June 18, 2021, the Defendant requested from CBRE a Job Description form be completed regarding the physical demands of the Plaintiff's occupation, which was completed by Wayne Walters, Project Management Supervisor for CBRE. Mr. Walters described the Plaintiff's occupation in part as not requiring any lifting, carrying, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, fine manipulation, simple or firm grasping, exposure to any environmental conditions, or use of lower extremities for foot controls; sitting constantly; standing frequently, and walking occasionally. This description was provided to the Defendant, but would also later be contested by the Plaintiff.

36.     On June 29, 2021, the Defendant had an updated occupation review completed by Cindy Herzog, MS, CRC, and it was based off the physical demand description provided by Mr. Walters. Ms. Herzog concluded that "the DOT of Project Director/189.117·030/Sedentary on file is accurate."

37.     On June 30, 2021, the Defendant had an updated Occupational Analysis completed by Randy Norris, MS, CRC, to compare the Plaintiff's restrictions and limitations with his ability to perform in the sedentary level position of Project Director (which is not an accurate description of the Plaintiff's own occupation). While Mr. Norris did conclude that the Plaintiff would be capable of performing within this position, his review was based solely on the paper-file review report completed by Dr. Polanco and the inaccurate description of the Plaintiff's prior occupation.

38.     On July 9, 2021, the Defendant issued a letter to the Plaintiff, notifying him of its intent to maintain the decision to terminate his LTD benefits, but also to provide the Plaintiff with an opportunity to review and respond to the above-referenced reports from Dr. Burns, Dr.

Polanco, Ms. Herzog, Mr. Norris, as well as the job description provided from Mr. Walters. The Defendant also requested for the Plaintiff to respond by July 22, 2021.

39.    On July 9, 2021, the undersigned responded to the Defendant, requesting additional time to respond to the new reports provided by the Defendant, and pointing out that the Defendant's reviewing physicians had failed to contact the Plaintiff's new physicians. The letter stated in part,

> Your letter indicates that your peer physicians have reached out to Drs. Rau and McCanna submitting questionnaires, but have not received responses. As we have previously advised, Mr. Boles last sought treatment from Drs. Rau and McCanna in 2019 and 2020, respectively, prior to his move to Michigan. These doctors are located in Indiana. We have also advised Cigna that Mr. Boles is currently seeing treating from Dr. Kyle McKinney and Dr. Christie McKinney who are located in Michigan. We have provided Cigna with Drs. McKinney's respective addresses, contact information and medical records. Mr. Boles has forwarded the peer review reports to Drs. McKinney for their review and we will provide Cigna with responses upon our receipt. We would also ask for an extension to August 22nd to provide such responses. Please advise if an extension will be allowed.

40.    The July 9, 2021 letter also further responded to the Job Description provided by Mr. Walters, and notified the Defendant that Mr. Walters was a former peer of the Plaintiff who had worked in a different department before he became manager of the Plaintiff's former department, and that the Plaintiff had found a number of discrepancies between the daily job requirements and the requirements as provided by Mr. Walters, and which have been described in detail in **Exhibit 1**.

41.    On July 23, 2021, the Defendant issued a letter to the Plaintiff notifying him that it was maintaining the decision to terminate his LTD benefits. The decision was based on the inaccurate job description of Project Director (that the Plaintiff's former occupation was a sedentary exertional level position) and the corresponding reports provided by Dr. Burns, Dr. Polanco, Ms. Herzog, and Mr. Norris. The letter also proclaimed that no

correspondence was ever received from the Plaintiff in response to the Defendant's additional reports, and stated in part,

> On July 9, 2021 we provided you an opportunity review and respond to any new evidence and/or to rationale for our proposed adverse decision, and advised that you had to submit any response by July 22, 2021, or contact us by that date to request additional time to respond. As of the date of this letter, we have not received any response from you or a request for additional time. Therefore, this letter is our final, written appeal decision.

42. In the July 23, 2021 final denial letter, the Defendant also informed the Plaintiff that he had "*exhausted all administrative levels of appeal*" and that the Plaintiff had "*the right to bring a legal action for benefits under the Employee Retirement Income Security Act of 1974 (ERISA) section 502(a)*".

43. On July 29, 2021, in response to the peer record reviews provided by the Defendant, one of the Plaintiff's treating physicians, Christie McKinney, M.D., provided a To Whom It May Concern Letter, which stated:

> I am writing in regards to my patient Dennis Boles, DOB: [XX/XX/]1956. Dennis was referred to my office by his primary care provider, Dr. Kyle McKinney on 8/13/2020. I saw Dennis for his initial visit in my office on 10/20/2020. Dennis lives in Michigan and is no longer under the care of Dr. Rau or Dr. McCanna and any questions related to his treatment and prognosis should have been directed to my office.
>
> Dennis has a neurological diagnosis of Severe Axonal sensorimotor polyneuropathy which causes pain, numbness, tingling and burning in his legs and feet as well as foot drop in both feet, left worse than right. Dennis had an EMG done on 6/25/2019 which diagnosed the above diagnosis. Due to the pain, weakness and fall risk associated with the diagnosis Dennis is unable to walk without the use of an assistive device, he cannot drive or sit for periods longer than 30 minutes. Dennis also cannot stand for longer than 10 minutes without causing increased pain and trembling in his left leg. Dennis has had multiple falls in the last year due to his diagnosis. These all prevent him from being able to do the job he previously was able to. Dennis continues with the same significant limitations and disabilities that he had previously.

44. On August 6, 2021, the undersigned submitted Dr. McKinney's "To Whom It May Concern" letter to the Defendant, acknowledging that a final decision had already been issued by the Defendant, but requesting for the Defendant to take Dr. McKinney's response

into consideration based on the previous request for additional time to respond to the Defendant's new information. As of the date of this filing, the Defendant had not provided any response.

**COUNT I**
**Claim for Benefits Pursuant to ERISA §502(a)(1)(B),**
**29 U.S.C. 1132(a)(1)(B) against Defendant**

45.     The Plaintiff incorporates paragraphs 1 through 44 above as if fully restated herein.

46.     ERISA §502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B) permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan and/or to clarify his rights to future benefits under the terms of a plan.

47.     The failure to pay full disability benefits as described above are in direct violation of the terms of the Plan.

48.     The Plan has failed to pay disability benefits to the Plaintiff despite the recommendations of his physicians and disabling medical conditions.

49.     The failure and refusal of the Plan to pay the benefits owed the Plaintiff under the Plan is a breach of the terms and provisions of the Plan.

50.     In addition, the Plan has failed to properly and thoroughly investigate the Plaintiff's claim in the manner required by ERISA's fiduciary and claims procedure requirements.

51.     The actions of the Plan have caused damage to the Plaintiff in the form of the denial of long term disability benefits.

52.     In addition, because the Plan denied the payment of the Plaintiff's long term disability benefits, the Plaintiff became ineligible for other benefits provided through his employment such as pension, medical benefits, and the waiver of group life insurance premiums.

## PRAYER FOR RELIEF

Plaintiff requests that this Honorable Court grant the following relief:

A.      A declaratory judgment pursuant to ERISA §502(a)(1)(B), 29 U.S.C. 1132 (a)(1)(B) and 28 U.S.C. 2201, declaring that the Plaintiff is entitled to the group employee benefits in the proper amounts as set forth in the Plan in effect at the time benefits became payable and that the Defendant has violated the Plan and its fiduciary duties by failing to pay these benefits and honor the group waiver of life premium.

B.      A full and accurate accounting by the Defendant of all computations for the Plaintiff's employee benefits, in sufficient detail so that the Plaintiff may ascertain that his benefits are being paid in the proper amount.

C.      An Order compelling the Defendant to pay the Plaintiff forthwith the full amount of employee benefits due to him and to continue such payments for the period set forth in the Plan, including interest on all unpaid benefits.

D.      An Order awarding reasonable attorney fees and costs pursuant to ERISA §502(g)(1), 29 U.S.C. 1132 (g)(1).

E.      Such other relief as may be just and appropriate.


Dated:  February 21, 2022                    /s/ Troy W. Haney
                                             Troy W. Haney (P48614)
                                             HANEY LAW OFFICE, P.C.
                                             Attorney for Plaintiff
                                             330 East Fulton Street
                                             Grand Rapids, MI 49503

19